**UNITED STATES DISTRICT COURT**

**SOUTHERN DISTRICT OF CALIFORNIA**

MARK MADSON, as Trustee of the MJM Trust,

Plaintiff,

v.

ASTRA NAVIGATION, INC.,

Defendant.

Case No. 26-cv-06523-BAS-SBC

**ORDER:**

**(1) DENYING WITHOUT PREJUDICE PLAINTIFF'S APPLICATION FOR TEMPORARY RESTRAINING ORDER (ECF No. 2); AND**

**(2) DENYING AS MOOT PLAINTIFF'S EX PARTE APPLICATION FOR ORDER SHORTENING TIME (ECF No. 3)**

Before the Court is an Application for a Temporary Restraining Order ("TRO") and Order Shortening Time ("Application") filed by Plaintiff Mark Madson, as trustee of the MJM Trust ("Plaintiff"). (TRO, ECF No. 2.) Plaintiff has also filed an Ex Parte Application for Order Shortening Time to Brief and Decide Application for Temporary Restraining Order ("Ex Parte Application"). (ECF No. 3.)

For the reasons below, the Court **DENIES WITHOUT PREJUDICE** the Application and **DENIES AS MOOT** the Ex Parte Application.

## I. BACKGROUND

### A. The Investors' Rights Agreement

Plaintiff is a preferred stockholder of Defendant Astra Navigation, Inc. ("AstraNav"), a Delaware corporation. (Compl. ¶¶ 9–10, 14, ECF No. 6.) Plaintiff and AstraNav are parties to an Investors' Rights Agreement dated September 15, 2022. (*Id.* ¶ 13; Decl. of Mark Madson ("Madson Decl.") ¶ 4, Ex. 1 ("IRA"), ECF No. 2-1.) The IRA gives each "Major Investor," a preferred stockholder holding at least a specified amount of preferred stock, a contractual inspection right. (IRA §§ 1.18, 3.2.) Section 3.2 provides:

> The Company shall permit each Major Investor (provided that the Board of Directors has not reasonably determined that such Major Investor is a competitor of the Company), at such Major Investor's expense, to visit and inspect the Company's properties; examine its books of account and records; and discuss the Company's affairs, finances, and accounts with its officers, during normal business hours of the Company as may be reasonably requested by the Major Investor; *provided, however*, that the Company shall not be obligated pursuant to this Section 3.2 to provide access to any information that it reasonably and in good faith considers to be a trade secret or confidential information (unless covered by an enforceable confidentiality agreement, in form acceptable to the Company) or the disclosure of which would adversely affect the attorney-client privilege between the Company and its counsel.

(*Id.* § 3.2.) Investors may use confidential information obtained under the IRA only to monitor or make decisions about their investment, and may share it with their attorneys, accountants, consultants, and other professionals as reasonably necessary for that purpose. (*Id.* § 3.4; Compl. ¶ 16.) The provisions governing Major Investors, including Section 3.2 and the definition of "Major Investor," may be amended with the written consent of AstraNav and the holders of a majority of the Registrable Securities held by the Major Investors. (IRA § 6.6.) Plaintiff alleges, and AstraNav's own financing notice reflects, that Plaintiff is a Major Investor. (Compl. ¶¶ 14, 37; Madson Decl. ¶ 5.)

**B. Plaintiff's Inspection Request**

On October 20, 2026, Plaintiff invoked Section 3.2 and requested records from September 2022 through September 2026 in several categories. These included corporate and Board records, general-ledger and bank records, payroll and tax records, material contracts, and records concerning AstraNav's acquisition of I2M Systems, Inc. ("I2M"). (Compl. ¶ 18; Madson Decl. ¶ 6, Ex. 2.)

On October 30, AstraNav acknowledged the request but objected that it was overbroad and asked Plaintiff to narrow it before an inspection could be scheduled. (Compl. ¶ 19.) AstraNav also objected to producing I2M's records and to Plaintiff's use of an outside financial analyst. It required a separate confidentiality agreement and an advance retainer toward its costs. (*Id.*)

On October 30, AstraNav acknowledged the request but objected that it was overbroad and asked Plaintiff to narrow it before an inspection could be scheduled. (Compl. ¶ 19; Madson Decl. ¶ 6, Ex. 2.) AstraNav also objected to producing I2M's records and to Plaintiff's use of an outside financial analyst. (Compl. ¶ 19; Madson Decl. Ex. 2.) It required a separate confidentiality agreement and an advance retainer toward its costs. (Compl. ¶ 19; Madson Decl. ¶ 6, Ex. 2.)

On November 3, Plaintiff said it was willing to refine the categories and time periods, asked AstraNav to identify the materials it would make available, offered to sign a confidentiality agreement, and withdrew its request for I2M's independent records. Plaintiff maintained its request to use an analyst and rejected the retainer. (*Id.* ¶ 20; Madson Decl. ¶ 7, Ex. 3.)

Plaintiff alleges that on November 10, AstraNav deemed the request "moot" because Plaintiff had not submitted a narrowed request, and reaffirmed its positions on the retainer and outside consultants. (Compl. ¶ 21.) [1]

[1] The Complaint is not verified. It is signed only by Plaintiff's counsel and is not supported by an oath, affidavit, or declaration under penalty of perjury. (*See* Compl. at 11:8–21.) The Court therefore

**C. The Proposed Financing**

On November 9, 2026, AstraNav asked its stockholders to approve, by written consent, a Series Seed-Plus preferred stock financing. AstraNav told stockholders that it was targeting an initial closing in the coming days and that the financing was critical to its survival. (Compl. ¶ 25; Madson Decl. ¶ 8, Ex. 4.) The consent materials include an amended and restated IRA that would raise the investment threshold for Major Investor status. (Compl. ¶ 6; Madson Decl. ¶ 9, Ex. 5 § 2.18.) Plaintiff asserts that its holdings fall below the new threshold, so the amendment would end its inspection rights under Section 3.2. (Madson Decl. ¶ 9.)

**D. This Action**

On November 19, 2026, Plaintiff filed this action (ECF No. 1), asserting a single claim for breach of Section 3.2 of the IRA. (Compl. ¶¶ 35–42.) Plaintiff expressly disclaims any fiduciary-duty claim or challenge to the validity of the financing. (*Id.* ¶ 7.) Paragraph 23 of the Complaint narrows Plaintiff's request to six categories of records from September 15, 2022, to the present:

- financial statements and general-ledger detail;
- Board materials concerning the financing and related director appointments;
- records concerning management compensation;
- records concerning a loan from AstraNav's chief executive officer;
- the financing documents; and
- AstraNav-held records concerning I2M.

(*Id.* ¶ 23.) Plaintiff seeks:

- a declaration of its inspection rights;
- specific performance requiring AstraNav to produce those records; and
- an injunction barring the initial closing until Plaintiff has received the records and had ten business days to review them.

---

cites the Complaint only for what Plaintiff alleges and relies on the Madson Declaration and its exhibits for the facts recounted in this paragraph.

(*Id.*, Prayer ¶¶ A–C.)

The same day, Plaintiff filed the Application (ECF No. 2), the Ex Parte Application (ECF No. 3), and a Motion to Seal (ECF No. 4). The Application asks the Court to:

1. order AstraNav to produce the records identified in paragraph 23 of the Complaint; and
2. restrain AstraNav from completing the initial Series Seed-Plus closing or issuing securities in the financing until the earliest practicable adversarial hearing.

At that hearing, Plaintiff would ask to extend the restraint until it has had ten business days to review the records. (TRO 10:15–17.) On November 19, 2026, the Court granted in part and denied in part the Motion to Seal. (ECF No. 5.) AstraNav has since appeared through counsel (ECF No. 8), and Plaintiff has filed a notice of service of the Complaint, the Motion to Seal, the Ex Parte Application, and the Court's sealing order (ECF No. 9).

## II. LEGAL STANDARD

A TRO or preliminary injunction is an extraordinary remedy, and is never awarded as a matter of right but only "upon a clear showing that the plaintiff is entitled to such relief." *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 22 (2008). A TRO is "an extraordinary and drastic remedy." *Mazurek v. Armstrong*, 520 U.S. 968, 972 (1997) (per curiam) (citation omitted). It is granted only if there is a true emergency which requires "preserving the status quo and preventing irreparable harm." *Granny Goose Foods, Inc. v. Bhd. of Teamsters and Auto Truck Drivers Local No. 70*, 415 U.S. 423, 439 (1974).

The test for issuing a TRO is the same as that for issuing a preliminary injunction. *See Stuhlbarg Int'l Sales Co. v. John D. Brush & Co.*, 240 F.3d 832, 839 n.7 (9th Cir. 2001). Accordingly, to obtain a TRO, Plaintiff must show (1) that it is likely to succeed on the merits of its claim, (2) that it is likely to suffer irreparable harm in the absence of preliminary relief, (3) that the balance of equities tips in its favor, and (4) that an injunction

is in the public interest. *Stormans, Inc. v. Selecky*, 586 F.3d 1109, 1127 (9th Cir. 2009); *Zhang v. Barr*, 612 F. Supp. 3d 1005, 1012 (C.D. Cal. 2020).

The Ninth Circuit also has an alternative to this test, under which a preliminary injunction is appropriate if "serious questions going to the merits were raised and the balance of the hardships tips sharply in the plaintiff's favor," thereby allowing preservation of the status quo when complex legal questions require further inspection or deliberation. *All. for the Wild Rockies v. Cottrell*, 632 F.3d 1127, 1134–35 (9th Cir. 2011). However, the "serious questions" approach supports the court's entry of a TRO only "so long as the plaintiff also shows that there is a likelihood of irreparable injury and that the injunction is in the public interest." *Id.* at 1135. The moving party bears the burden of persuasion and must make "a clear showing that" it is entitled to such relief. *Winter*, 555 U.S. at 22.

Where a TRO is sought without notice, Rule 65(b)(1) adds two requirements. The Court may issue such an order "only if" (A) "specific facts in an affidavit or a verified complaint clearly show that immediate and irreparable injury, loss, or damage will result to the movant before the adverse party can be heard in opposition," and (B) "the movant's attorney certifies in writing any efforts made to give notice and the reasons why it should not be required." Fed. R. Civ. P. 65(b)(1); *see Bus. Guides, Inc. v. Chromatic Commc'ns Enters., Inc.*, 498 U.S. 533, 543–44 (1991) (Rule 65(b) "provides specifically that a TRO application must be accompanied by an affidavit or verified complaint that sets forth the facts").

Given the exigent nature of a TRO, a movant can rely on allegations in a verified complaint, exhibits, declarations, or affidavits, even if inadmissible under the Federal Rules of Evidence. *Khoury v. Noem*, 832 F. Supp. 3d 1005, 1012 (C.D. Cal. 2026). Unverified allegations in the pleadings and unsupported and conclusory statements are not enough to prevail on a motion for a TRO. *Id.* Testimony by a witness with knowledge "that an item

is what it is claimed to be," including in a declaration, can supply the foundation to verify exhibits attached to that declaration. *See* Fed. R. Evid. 901(a), 901(b)(1).[2]

## III. ANALYSIS

### A. Likelihood of Success on the Merits

#### 1. Application of Delaware Law

Because the Court's jurisdiction rests on diversity, it applies California's choice-of-law rules. *Klaxon Co. v. Stentor Elec. Mfg. Co.*, 313 U.S. 487, 496 (1941). California enforces a contractual choice-of-law provision if (1) the chosen state has a substantial relationship to the parties or their transaction, or there is another reasonable basis for the parties' choice, and (2) applying the chosen state's law would not conflict with a fundamental policy of California in a matter in which California has a materially greater interest. *Nedlloyd Lines B.V. v. Superior Court*, 3 Cal. 4th 459, 464–66 (1992); *Wash. Mut. Bank, FA v. Superior Court*, 24 Cal. 4th 906, 916–17 (2001).

Here, Section 6.2 of the IRA provides that the agreement is governed by Delaware law. (IRA § 6.2; Compl. ¶ 17.) Delaware has a substantial relationship to the parties because AstraNav is a Delaware corporation. (Compl. ¶ 10.) *See Nedlloyd*, 3 Cal. 4th at 467 (finding a substantial relationship where a party was incorporated in the chosen jurisdiction). Nor does applying Delaware law to a contractual right to inspect a Delaware corporation's books and records conflict with any fundamental policy of California. Plaintiff pleads its claim under Delaware law (Compl. ¶ 17), and the Court discerns no reason to depart from the parties' choice. Accordingly, Delaware law governs Plaintiff's breach of contract claim.

---

[2] Each exhibit cited in this Order is attached to the Madson Declaration. Madson states that he has personal knowledge of the facts in the declaration as trustee of the MJM Trust, and he attests that each exhibit is a true and correct copy of the following: (1) the IRA (Ex. 1); (2) the email exchange containing Plaintiff's October 20 inspection request and AstraNav's October 30 objection (Ex. 2); (3) Plaintiff's November 3 email response (Ex. 3); (4) AstraNav's November 9 email transmitting the stockholder consent (Ex. 4); and (5) the updated proposed amended IRA that AstraNav circulated on November 16 (Ex. 5). (Madson Decl. ¶¶ 2, 4, 6–9.) Madson signed the declaration under penalty of perjury. (ECF No. 2-1 at 4:5–13.) His sworn testimony is sufficient to authenticate the exhibits for purposes of this Application. *See* Fed. R. Evid. 901(a), (b)(1); 28 U.S.C. § 1746.

### 2. Breach of Contract Elements Under Delaware Law

Under Delaware law, a plaintiff asserting breach of contract must show "the existence of the contract," "the breach of an obligation imposed by that contract," and "the resultant damage to the plaintiff." *VLIW Tech., LLC v. Hewlett-Packard Co.*, 840 A.2d 606, 612 (Del. 2003). Delaware courts give clear and unambiguous contract terms their plain meaning, and a term is ambiguous only when it is reasonably susceptible of different interpretations. *Osborn ex rel. Osborn v. Kemp*, 991 A.2d 1153, 1159–60 (Del. 2010). A party seeking specific performance must establish its entitlement by clear and convincing evidence. *Id.* at 1158.

Here, Plaintiff claims that the binding contractual obligations consist of AstraNav's obligation under Section 3.2 of the IRA to permit each Major Investor, at its own expense, to visit and inspect AstraNav's properties, examine its books of account and records, and discuss its affairs, finances, and accounts with its officers during normal business hours, as may be reasonably requested. (Compl. ¶¶ 15, 36; IRA § 3.2.) To support its use of an outside financial analyst, Plaintiff also relies on Section 3.4, which permits an investor to share confidential information with its attorneys, accountants, consultants, and other professionals as reasonably necessary to monitor its investment. (Compl. ¶¶ 16, 20; IRA § 3.4.)

First, the IRA is a written agreement executed by AstraNav and by Mark and Joan Madson individually. (Madson Decl. Ex. 1 (signature pages).) The MJM Trust (the "Trust"), formed in 2023, is listed as the investor in their place in AstraNav's proposed amended IRA, and AstraNav's correspondence acknowledges the Trust's request "as Trustee of the MJM Trust" to exercise inspection rights under Section 3.2 and invokes the Trust's waiver of rights under the same agreement. (*Id.* Ex. 2; *id.* Ex. 5 (Schedule A); *see also* Compl. ¶ 37.) Section 3.4 of the IRA separately permits each Investor to disclose confidential information "to its attorneys, accountants, consultants, and other professionals to the extent reasonably necessary to obtain their services in connection with monitoring its investment in the Company." (IRA § 3.4.) Accordingly, for purposes of this

Application, the Court finds that binding contractual obligations under Sections 3.2 and 3.4 of the IRA exist. *See VLIW Tech.*, 840 A.2d at 612; *Osborn*, 991 A.2d at 1158 (a valid contract exists where the parties intended to be bound, the terms are sufficiently definite, and the parties exchanged legal consideration); *Edgar v. Troy Holdings, Inc.*, No. N23C-05-232 SPL, 2025 WL 1381775, at *4 (Del. Super. Ct. May 13, 2025) ("A signed writing 'generally offers the most powerful and persuasive evidence of the parties' intent to be bound.' ").

Second, however, it is unclear that AstraNav has breached the relevant contractual provisions as written. Section 3.2 obligates AstraNav to permit inspection "as may be reasonably requested by the Major Investor." (IRA § 3.2.) Moreover, the proviso to Section 3.2 relieves AstraNav of any obligation to provide access to information "that it reasonably and in good faith considers to be a trade secret or confidential information (unless covered by an enforceable confidentiality agreement, in form acceptable to the Company)." (*Id.*) AstraNav did not refuse Plaintiff's request outright. It acknowledged the request, stated that it "will meet its obligations under the Agreement," and objected that a request covering "four years of essentially every category of corporate, financial, payroll, tax, contractual and transactional records" was not reasonable under Section 3.2. (Madson Decl. Ex. 2.) AstraNav invited Plaintiff to send "a narrowed request" and stated that it would "review it in good faith." (*Id.*) Plaintiff did not do so. Its November 3 response offered to "discuss refinements" but asked AstraNav first to identify what it would make available, and it withdrew only its request for I2M's independent records. (*Id.* Ex. 3.) Plaintiff's request for the specific narrowed list of records in its Complaint does not appear elsewhere on the record. (*See* Compl. ¶ 23; *see generally* Madson Decl.) Plaintiff also alleges that AstraNav declared the request "moot" on November 10. Since the Complaint is unverified, the Court cannot consider Plaintiff's narrowed records request or AstraNav's alleged declaration regarding Plaintiff's request is moot as part of the record for purposes of deciding Plaintiff's Application. *See* (Rule 65(b) (providing that a TRO application must be accompanied by an affidavit or verified complaint that sets forth the facts); 28

U.S.C. § 1746 (a complaint is verified by oath or affidavit); *Khoury*, 832 F. Supp. 3d at 1012 ("Unverified allegations in the pleadings and unsupported and conclusory statements are not enough to prevail on a motion for a TRO."). Thus, on this record, the Court cannot conclude that AstraNav refused a reasonably scoped request.

Nor is it clear that AstraNav's remaining conditions breach Section 3.2. Plaintiff offers reasonable arguments that AstraNav exceeded what Section 3.2 permits by demanding an advance retainer to fund its outside counsel and by proposing confidentiality terms that would bar any use or disclosure of the information. (*See* Madson Decl. Ex. 3.) But AstraNav's contrary construction of these provisions, as set forth in its October 30, 2026, correspondence, is not unreasonable. (*See* Madson Decl. Ex. 2.) AstraNav reads "at such Major Investor's expense" to place all costs of the inspection on the investor, including AstraNav's costs of preparing for and supervising it. (*Id.*) It reads "in form acceptable to the Company" to permit it to set the terms of the required confidentiality agreement. (*Id.*) And it reads Section 3.2's grant of the inspection right to "each Major Investor," together with Section 3.4's limits on use and disclosure, as not extending to third-party advisors. (*Id.*) Accordingly, the Court finds Sections 3.2 and 3.4 of the IRA are at least fairly susceptible to both parties' readings. *See Osborn*, 991 A.2d at 1160. Disputed questions of contract interpretation of this kind fall short of showing that "the law and facts clearly favor [Plaintiff's] position," as the mandatory relief Plaintiff seeks requires. *Garcia v. Google, Inc.*, 786 F.3d 733, 740 (9th Cir. 2015) (en banc).

Finally, the relief Plaintiff requests exceeds the right Section 3.2 confers. Section 3.2 grants a right to "visit and inspect" AstraNav's properties and to "examine" its books and records "during normal business hours." (IRA § 3.2.) It does not explicitly require AstraNav to produce copies of records, electronically or otherwise, within two business days, yet that is what Plaintiff asks the Court to order. (TRO 10:12–13; Compl., Prayer ¶ B.) Under Delaware law, the Court must give effect to the plain meaning of clear and unambiguous contract terms, not supply terms the parties did not include. *See GMG Cap. Invs., LLC v. Athenian Venture P'rs I, L.P.*, 36 A.3d 776, 779–80 (Del. 2012).

**B. Irreparable Harm**

Plaintiff must also show that it "is likely to suffer irreparable harm in the absence of preliminary relief." *Winter*, 555 U.S. at 20. A mere possibility of irreparable harm is not enough. *Id.* at 22. "Speculative injury does not constitute irreparable injury sufficient to warrant granting a preliminary injunction." *Caribbean Marine Servs. Co. v. Baldrige*, 844 F.2d 668, 674 (9th Cir. 1988). A likelihood of irreparable harm must be grounded in evidence, not conclusory assertions. *See Herb Reed Enters., LLC v. Fla. Ent. Mgmt., Inc.*, 736 F.3d 1239, 1249–50 (9th Cir. 2013). To the extent Plaintiff seeks an order compelling AstraNav to produce records, the showing is heightened, because mandatory relief is "not granted unless extreme or very serious damage will result" and is "not issued in doubtful cases." *Garcia*, 786 F.3d at 740 (quoting *Marlyn Nutraceuticals, Inc. v. Mucos Pharma GmbH & Co.*, 571 F.3d 873, 879 (9th Cir. 2009)).

In addition, "there must be a relationship between the injury claimed in the motion for injunctive relief and the conduct asserted in the underlying complaint." *Pac. Radiation Oncology, LLC v. Queen's Med. Ctr.*, 810 F.3d 631, 636 (9th Cir. 2015). Where the claimed injury is the inability to exercise a contractual right, the "inability to exercise contractual rights does not amount, in itself, to irreparable harm for the purposes of a preliminary injunction," particularly where "the purpose of the action is to determine Plaintiff's contract rights." *Fed. Ins. Co. v. Dencity, Inc.*, No. SACV 07-1458-DOC (RNBx), 2008 WL 11342968, at *4 (C.D. Cal. Jan. 28, 2008). Likewise, "the terms of a contract alone cannot require a court to grant equitable relief." *Barranco v. 3D Sys. Corp.*, 952 F.3d 1122, 1130 (9th Cir. 2020) (collecting cases).

Courts have recognized, however, that where wrongful conduct deprives a plaintiff of a unique contract right, the loss may constitute irreparable harm. *See Optinrealbig.com, LLC v. Ironport Sys., Inc.*, 323 F. Supp. 2d 1037, 1051 (N.D. Cal. 2004) (citing *Reuters Ltd. v. United Press Int'l, Inc.*, 903 F.2d 904, 908–09 (2d Cir. 1990)). Courts have likewise found irreparable harm where a defendant's conduct compromises a plaintiff's exclusive property rights, such as a copyright owner's "exclusive right to decide when and how their

material should be reproduced and/or distributed." *Capitol Recs., LLC v. BlueBeat, Inc.*, No. CV 09-8030-JFW (JCx), 2009 WL 10681963, at *5 (C.D. Cal. Nov. 5, 2009) (quoting *Metro-Goldwyn-Mayer Studios Inc. v. Grokster, Ltd.*, 518 F. Supp. 2d 1197, 1219 (C.D. Cal. 2007)).

By contrast, "economic injury alone does not support a finding of irreparable harm, because such injury can be remedied by a damage award." *Rent-A-Center, Inc. v. Canyon Television & Appliance Rental, Inc.*, 944 F.2d 597, 603 (9th Cir. 1991). The loss of bargaining power or negotiating position likewise does not constitute irreparable harm. *See In re Irwin*, 338 B.R. 839, 854 (E.D. Cal. 2006).

Plaintiff identifies two harms: (1) the loss of its inspection right if the financing closes and the amended IRA raises the Major Investor threshold (TRO 7:20–23, 8:13–22), and (2) the loss of its opportunity to "cast an informed vote" on the financing (*id.* at 8:23–9:2). (*See also id.* at 3:1–6.) Neither warrants the relief Plaintiff seeks.

### 1. Loss of the Inspection Right

Plaintiff first argues that, once the financing closes, it "may cease to qualify as a Major Investor" and lose the inspection right it seeks to enforce, allowing AstraNav to "withhold the requested records until the Financing closes." (*Id.* at 8:15–21.)

The loss Plaintiff fears would flow not from the breach it alleges but from an amendment the IRA expressly permits. Section 6.6 allows the provisions governing Major Investors, including Section 3.2 and the definition of "Major Investor," to be amended with the written consent of AstraNav and the holders of a majority of the Registrable Securities held by the Major Investors. (IRA § 6.6.) Plaintiff does not allege that the proposed amendment fails to comply with Section 6.6 or that the required consent is lacking. It expressly disclaims any effort to "invalidate the financing." (Compl. ¶ 7.) Plaintiff's inspection right was always subject to amendment on these terms. Losing it through a valid amendment would be a consequence of the bargain Plaintiff struck, not an injury caused by AstraNav's alleged breach. *See Pac. Radiation Oncology*, 810 F.3d at 636.

In addition, Plaintiff has not shown that the amendment would extinguish its claim for any breach of Section 3.2 of the IRA that occurred before the amendment takes effect. "The inability to exercise contractual rights does not amount, in itself, to irreparable harm for the purposes of a preliminary injunction," because a plaintiff who prevails on the merits will receive the benefit of its bargain. *Dencity*, 2008 WL 11342968, at *4. The same is true here. To the extent Plaintiff remains entitled to inspection under the IRA, it may obtain that relief if it prevails. To the extent a valid amendment ends that entitlement, the loss reflects the terms of Plaintiff's bargain rather than an irreparable injury caused by AstraNav's alleged breach.

Plaintiff may argue that its inspection right is unique, because it waived its statutory inspection rights (IRA § 3.5), and that the loss of a unique contract right can constitute irreparable harm. *See Optinrealbig.com*, 323 F. Supp. 2d at 1051 (citing *Reuters*, 903 F.2d at 908–09). But that principle applies where *wrongful conduct* deprives the plaintiff of the right. Here, any loss of Plaintiff's inspection right would result from an amendment the IRA expressly authorizes and that Plaintiff does not challenge, not from AstraNav's alleged breach. (IRA § 6.6; Compl. ¶ 7.) Plaintiff does not identify any harm to its business or goodwill of the kind that may render a loss irreparable. Its underlying interest is in the value of its investment, which is economic. *Rent-A-Center*, 944 F.2d at 603 ("[E]conomic injury alone does not support a finding of irreparable harm, because such injury can be remedied by a damage award.").

**2. Loss of an Informed Vote**

Plaintiff next contends that it "gets one opportunity to cast an informed vote on the Financing," an opportunity it asserts would be foreclosed by AstraNav's withholding of the records Plaintiff requested under Section 3.2 until after the financing closes. (TRO 8:23–9:2.) But Section 3.2 grants only a right to inspect AstraNav's books and records. It does not entitle Plaintiff to any particular information before voting on a corporate transaction. (IRA § 3.2.) Whatever disclosure obligations accompany a stockholder consent solicitation arise, if at all, under Delaware fiduciary law, and Plaintiff expressly

disclaims any fiduciary-duty claim. (Compl. ¶ 7.) An injury that does not flow from the claim pleaded cannot support injunctive relief. *See Pac. Radiation Oncology*, 810 F.3d at 636.

Next, even assuming Section 3.2 protected an opportunity to cast an informed vote, the harm Plaintiff describes would not be irreparable. Plaintiff's interest in reviewing the records before it votes is, at bottom, an interest in its position with respect to the financing and the value of its investment. But the loss of bargaining power or negotiating position does not constitute irreparable harm. *See In re Irwin*, 338 B.R. at 854. And "economic injury alone does not support a finding of irreparable harm, because such injury can be remedied by a damage award." *Rent-A-Center*, 944 F.2d at 603.

**3. Effectiveness of Requested Relief**

The relief Plaintiff seeks would not remedy the harm to Plaintiff's ability to cast an informed vote. Plaintiff "does not seek to halt AstraNav's solicitation efforts, prevent a stockholder vote, or interfere with the Company's ordinary business operations." (TRO 9:8–10.) Instead, it asks only that the Court restrain AstraNav from "completing the initial Series Seed-Plus closing or issuing securities in that financing" until an adversarial hearing can be held, and thereafter until AstraNav has produced the requested records and Plaintiff has had ten business days to review them. (*Id.* at 9:6–8, 10:13–17; *see also* Compl., Prayer ¶ C.)

Plaintiff expressly contemplates that, in the meantime, AstraNav "may continue soliciting stockholder approval," with "[o]nly the closing and issuance of securities" paused. (TRO 9:26–28.) Under Plaintiff's own proposal, then, the consent solicitation would proceed on its current schedule, and Plaintiff would be asked to decide whether to consent to the financing regardless of whether it had received the records. Pausing the closing would delay only the consummation of a transaction on which AstraNav's stockholders, including Plaintiff, would already have acted. The requested restraint therefore would not secure the "informed vote" that Plaintiff identifies as its injury.

* * *

Accordingly, Plaintiff has not shown that it is likely to suffer irreparable harm absent a temporary restraining order, much less the "extreme or very serious damage" required for mandatory relief. *Garcia*, 786 F.3d at 740. Again, a TRO is an extraordinary remedy, and is granted only if there is a true emergency which requires "preserving the status quo and preventing irreparable harm." *Granny Goose Foods, Inc.*, 415 U.S. at 439. This factor weighs against granting the Application because that does not appear to be the case here.

**C. Balance of Hardships and Public Interest**

In deciding whether to grant injunctive relief, courts "must balance the competing claims of injury and must consider the effect on each party of the granting or withholding of the requested relief," and "should pay particular regard for the public consequences in employing the extraordinary remedy of injunction." *Winter*, 555 U.S. at 24 (citations omitted). Under the serious-questions approach, a plaintiff must show that the balance of hardships tips "sharply" in its favor, that there is a likelihood of irreparable injury, and that an injunction is in the public interest. *Cottrell*, 632 F.3d at 1135.

In weighing the hardships, courts consider the financial and operational consequences that an injunction, and the delay it causes, would impose on the party restrained. *See Paramount Land Co. LP v. Cal. Pistachio Comm'n*, 491 F.3d 1003, 1005 (9th Cir. 2007) (balance of hardships did not favor plaintiff where injunction would deprive commission of assessments comprising approximately 25 to 30 percent of its revenues and likely force it to curtail operations significantly, while plaintiff had not shown serious financial or other distress); *Tribal Vill. of Akutan v. Hodel*, 859 F.2d 662, 663 (9th Cir. 1988) (balance of hardships favored staying injunction that would likely postpone preliminary activities and exploratory drilling by a year, where the cost of that delay would be unrecoverable); *see also Light Petroleum, Inc. v. ExxonMobil Oil Corp.*, No. CV 12-4689 PA (VBKx), 2013 WL 12113228, at *7 (C.D. Cal. June 12, 2013) (recognizing that further delay of a finalized transaction would impose "at least some hardship" on defendants, including "further unjustified risk to the transaction itself," although concluding that this hardship did not outweigh the plaintiff's).

The public interest inquiry, in turn, focuses on the injunction's effect on nonparties. When an injunction's reach is narrow and limited to the parties, the public interest is "at most a neutral factor in the analysis." *Stormans*, 586 F.3d at 1138–39 (citation omitted). But where the impact of an injunction "reaches beyond the parties, carrying with it a potential for public consequences, the public interest will be relevant." *Id.* at 1139.

Plaintiff contends that the burden on AstraNav is "comparatively limited" because Plaintiff seeks only a "short delay" of the closing, and AstraNav may continue soliciting stockholder approval and conducting its ordinary business. (TRO 9:20–27.) The record does not support that characterization. AstraNav has told its stockholders that it "faces an existential liquidity crunch" and that, without the financing, "everyone's investment will almost certainly go to zero." (Madson Decl. Ex. 4.) Plaintiff itself acknowledges that AstraNav's "asserted liquidity concerns are serious." (TRO 9:24.)

Nor would the requested restraint necessarily be brief. Plaintiff asks the Court to pause the closing until an adversarial hearing and then to extend the pause until AstraNav has produced the requested records and Plaintiff has had ten business days to review them. (*Id.* at 10:13–17.) Restraining a company-wide financing in that manner would impose hardship not only on AstraNav but also on its other stockholders, who are not parties to this action. That hardship outweighs Plaintiff's interest in inspecting AstraNav's records before the closing, particularly where Plaintiff retains its claim for any breach of Section 3.2.

The public interest in enforcing contracts does not alter this balance. The IRA that Plaintiff seeks to enforce also authorizes the very amendment Plaintiff seeks to delay (IRA § 6.6), and the public interest is not served by restraining a company-wide financing on the basis of a contract claim that is uncertain on this record. Accordingly, the balance of equities and the public interest weigh against relief. Because the balance of hardships does not tip sharply in Plaintiff's favor, and because Plaintiff has not shown a likelihood of irreparable harm, Plaintiff cannot obtain relief under the serious-questions approach either. *See Cottrell*, 632 F.3d at 1135.

### D. Remaining Procedural Considerations

Two procedural matters also bear on the Application. First, Plaintiff seeks relief "until the earliest practicable adversarial hearing, subject to Rule 65(b)(2)." (TRO 10:15.) But its papers, as filed, did not include the certification required to obtain a temporary restraining order without notice: a written certification by Plaintiff's attorney of "any efforts made to give notice and the reasons why it should not be required." Fed. R. Civ. P. 65(b)(1)(B). AstraNav has since appeared through counsel, and Plaintiff has filed a notice of service. (ECF Nos. 8, 9.) The Court therefore does not rest its decision on this omission.

Second, the Court may issue a temporary restraining order "only if the movant gives security in an amount that the court considers proper to pay the costs and damages sustained by any party found to have been wrongfully enjoined or restrained." Fed. R. Civ. P. 65(c). Given AstraNav's stated financial condition, the security required to restrain the financing would likely be substantial, and Plaintiff does not address security at all. Because the Court denies the Application, it need not determine the amount.

## IV. CONCLUSION

For the reasons above, Plaintiff's Application for a Temporary Restraining Order (ECF No. 2) is **DENIED WITHOUT PREJUDICE**. Should Plaintiff renew its request for injunctive relief, it may do so by a motion for a preliminary injunction and select a hearing date in accordance with Section 4.B of the Court's Standing Order for Civil Cases. The briefing schedule shall be governed by that hearing date and Civil Local Rule 7.1(e) unless the Court orders otherwise.

In light of the foregoing, Plaintiff's Ex Parte Application (ECF No. 3) is **DENIED AS MOOT**.

**IT IS SO ORDERED.**

**DATED: November 20, 2026**

[signature]

**Hon. Cynthia Bashant, Chief Judge**
**United States District Court**